JESSICA E. RAUFF, ESQ (SBN: 262264)
The Law Office of Jessica E. Rauff
1045 S. 12th Street
San Jose, California 95112
jrauff@gmail.com
Tel:  (408) 466-7436
Fax: (408) 668-0977

TIMOTHY SMYTH, ESQ. (SBN: 258661)
Rezn8 Systems, Inc., DBA Rezn8 Financial Services
2400 Country Drive, 2nd Floor
Fremont, CA  94536
tim.smyth@rezn8financial.com
Tel:   (510) 402-4388
Fax: (510) 744-9705

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REZN8 FINANCIAL SERVICES, INC., dba REZN8 FINANCIAL SERVICES INC., a California Corporations, MIRZA ZULFQAR ALI, an individual, and JESSICA E. RAUFF, an individual,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>EDMUND BROWN, California State Attorney General,  NANCY O'MALLEY, an individual, MATT BELTRAMO, an individual, RICK MONGE, an individual,<br><br>　　　　and DOES 1-50,<br><br>　　　　　　Defendant<br>_____ | CASE NO.:  3 10 CV 001799-001<br><br>Date: April 27, 2010<br><br><br>**FIRST AMENDED VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR DAMAGES**<br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiffs REZN8 SYSTEMS, INC., DBA REZN8 FINANCIAL SERVICES, MIRZA ZULFIQAR ALI, and JESSICA E. RAUFF, ESQ., allege as follows:

## I. INTRODUCTION

1. This is an action in response to an arbitrary and capricious criminal investigation undertaken by the Alameda County District Attorney's office with malice and prejudicial intent to shut down the operations of RezN8 Systems, Inc. dba RezN8 Financial Services for simply servicing customers in a publicly scrutinized area of business - loan modifications. Defendants omitted and misrepresented material facts in order to undertake a faulty and unlawful search and seizure warrant.  Defendants violated Plaintiffs' constitutional rights further by improperly searching and seizing, and as of the date of filing continue to impound, Plaintiffs' business records, computers, Plaintiff JESSICA E. RAUFF's attorney-client privileged communications, Plaintiff ZULFIQAR ALI's personal identification cards, blank checks, and numerous other objects outside the purview of the search warrant.

2. This action further challenges the constitutionality of Senate Bill 94 as unconstitutionally vague, an interference with existing contracts in violation of the Contract Clause and other Constitutional guarantees, which Defendants attempt to use to justify their malicious and unlawful actions.

## II.  THE PARTIES

3. Plaintiff REZN8 FINANCIAL SERVICES, INC., and REZN8 SYSTEMS, DBA REZN8 FINANCIAL SERVICES, ("REZN8'), is and was at all time relevant hereto, a California Corporation, in the County of Alameda, engaged in the business of home loan modifications.

4. Plaintiff MIRZA ZULFIQAR ALI, ("ALI") is and was at all times relevant hereto, CEO of REZN8.

2

5.  Plaintiff JESSICA E. RAUFF, ("RAUFF"), is and was at all times relevant hereto, an attorney licensed and practicing in the State of California, in the counties of Santa Clara, Santa Cruz, San Francisco, and Alameda.

6.  The Plaintiffs identified in paragraphs 2 through 4, above, shall be referred to collectively as "Plaintiffs."

7.  Defendant EDMUND BROWN is the California Attorney General, and is responsible, in part, for the creation and implementation of Senate Bill 2924.

8.  Defendants MATT BELTRAMO, ("BELTRAMO") and NANCY O'MALLEY (O'MALLEY) are and were at all times relevant hereto, attorneys licensed and practicing in the State of California, in the county of Alameda, in the employ of the Alameda County District Attorney's Office.

9.  Defendant RICK MONGE ("MONGE") is and was at all times relevant hereto, a California State inspector, in the employ of the Alameda County District Attorney's Office.

10.  Plaintiffs are not aware of the true names and capacities of defendants sued as DOES 1 through 50, inclusive, and therefore sue these defendants by such fictitious names. Each of these fictitiously named defendants is responsible in some manner for the activities alleged in this Complaint.  Plaintiffs will amend this Complaint to add the true names of the fictitiously named defendants once they are discovered.

11.  The Defendants identified in paragraphs 7 through 10, above, shall be referred to collectively as "Defendants."

12.  Whenever reference is made in this Complaint to any act of any Defendant(s), that allegation shall mean that each defendant acted individually and jointly with the other Defendants.

13. In doing the acts and/or omissions alleged herein, Defendants, each of them, acted under the color or authority and/or color of law.

## III. JURISDICTION & VENUE

14. This Court may properly exercise jurisdiction over this case pursuant to Title 28 U.S.C. §§ 1331 and 1343(3) based on federal question jurisdiction, because this suit asserts claims under 42 U.S.C. § 1983 for violations of the United States Constitution, specifically the Fourth, Sixth, and Fourteenth Amendments, Article 1 Section 10 of the Constitution, and other violations of federal statutory law.

15. The violations of law alleged in this Complaint occurred in Santa Clara County, Santa Cruz County, Marin County, Alameda County, and elsewhere throughout the Northern District of California and the United States.

## IV. FACTUAL BACKGROUND TO THE LOAN MODIFICATION BUSINESS.

### A. Predatory Lending

15. Over the last several years, our nation has made enormous progress in expanding capital to for previously under served borrowers. However, too many families are suffering today because of a growing incidence of abusive lending practices, aimed at loan resale capital, and against the American homeowner. Some examples of predatory lending used by lending institutions include[1];

   a. Lending to Subprime Borrowers

     • Subprime borrowers are borrowers with a credit score of around 640 or below, who do not have proper documentation to verify their income or assets. Subprime lending

---

[1] U.S. Department of Housing and Urban Development, Predatory Lending, May 18, 2009. Available at http://www.hud.gov/offices/hsg/sfh/pred/predlend.cfm; *see also* Mortgage News Daily, What Is Predatory Lending?, accessed April, 2010. Available at http://www.mortgagenewsdaily.com/mortgage_fraud/predatory_lending.asp.

4

was initially created for borrowers who are self-employed, and do not fully report all their earnings to the IRS, or for borrowers who started a new, high-paying job, whose tax returns do not yet reflect the income.

- Lending to subprime borrowers drastically increases the likelihood that the borrower will default on the loan because it is unknown how much money the borrower actually makes.

- A result of subprime lending is that an unqualified borrower can, and will, lose their home, forfeit their life savings/down payment, and permanently injure their credit.

- Lending to subprime borrowers is a practice that has been explored only recently and is already being abandoned. The sole purpose behind selling loans to borrowers who were not expected to be capable of repaying them was the high resale value of the security. The security had a high resale value because it was: 1) pooled with AAA and Alt/A rate loans which are backed by prime borrowers, and 2) sold by nationally recognized and trusted lending institutions.

b. Adjustable Rate Mortgages (ARMs)

- The riskiest of subprime loans are ARMs. ARMs are loans with a fixed interest rate, *in addition to* the variable rate of the market.

- A borrower with an ARM could be approved for a loan with a mortgage payment of $1,000.00, if the borrowers had a monthly income of $3,000.00. This would make it so their debt to income (DTI) ratio was 33% (A DTI of 35% is the federal cap for lending). However, with an ARM, if the loan was originated at a "teaser rate" of 3.5%, and then jumped to 11% (as many loans did when rates went up in 2006 & 2007), the borrowers' monthly payment would jump to $2,120.78. This left the borrowers with a DTI of 71%.

5

- This was typical, with "teaser rates" of 2 - 4%, adjusting as high 13%.

c. <u>Piggy-Backed Home Equity Lines of Credit (HELOCs)</u>

- HELOCs are lines of credit, often provided to subprime borrowers who did not qualify for a loan large enough to purchase the house.  The borrower was sold the high adjustable rate HELOC and forced to cash-out at closing, under the promise that the borrower would be able to refinance and consolidate the debts within a year.  (*See also* Prepayment Penalties, below).

- Specifically, with HELOC lending, the subprime borrower was able to purchase a home without a down payment. This induces clients who are not financially responsible or stable to buy a home, whether or not they could maintain making payments over the long term.

- In some cases, mortgage and HELOC payments would be cheaper than comparable rent.  However, over a long term period, the borrower is more likely to lose their home, lose their savings, ruin their credit, and ruin their chances of purchasing a loan that they likely could afford later down the line.

- Many borrowers were sold HELOCs, even though they had money for a down payment.  In such cases, the cash for the down deposit is stated in the loan application, and used to increase the available "assets" for the loan.

d. <u>Prepayment Penalties</u>

- Borrowers with high-interest subprime loans have a strong incentive to refinance as soon as their credit improves. However, up to 80% of all subprime mortgages carry a prepayment penalty - a fee for paying off a loan early.

- Prepayment penalties are typically effective for more than three years, and cost more than six months' interest.  In the prime market, only about 2% of home loans carry prepayment penalties of any length.

e.  Steering and Targeting

- Predatory lenders may steer borrowers into subprime mortgages, even when the borrowers could qualify for a mainstream loan. Vulnerable borrowers may be subjected to aggressive sales tactics and sometimes outright fraud.

- Fannie Mae has estimated that up to half of borrowers with subprime mortgages could have qualified for loans with better terms. According to a government study, over half (51%) of refinance mortgages in predominantly African-American neighborhoods are subprime loans, compared to only 9% of refinances in predominantly white neighborhoods.[2]

- Frequently, it is found that prime borrowers were told that they were purchasing fixed-rate, low-payment mortgages, and were sold subprime ARM loans.

f.  Loan Flipping

- A lender "flips" a loan by refinancing a loan to generate commission income without providing any net tangible benefit to the borrower.

- A lender may induce a borrower to refinance by promising a large cash-out at closing, without telling the borrower that most, if not all, of the cash-out would be consumed in the closing costs and fees.

- This is found frequently in Elder Abuse cases, where borrowers who have been paying on a fixed rate loan for years, are then mailed paperwork to "reduce your monthly

---

2  National Association of Consumer Advocates, Predatory Lending Practices, 2007. Available at http://www.naca.net/predatory-lending-practices/.

7

payment," which in fact is an ARM.  The fixed-income borrower would then be paying on an ARM.

g.  <u>Stated Income</u>

- A lender may underwrite a loan as stated income, to utilize a higher income than what the borrower actually had.

- For stated income, the underwriter and lender had a duty to inspect provided tax returns and W-2s to verify the income, however this was frequently not done.  (See internal Chase memo regarding adjustment of income to obtain "the findings you want," attached hereto as **Exhibit 1**).

- By approving of loans based on income that was inflated, borrowers were given loans they could not afford.

h.  <u>Yield Spread Premiums</u>

- The Yield Spread Premium (YSP) was originally created as a way to reduce the cost to borrowers.  The YSP generated closing costs by adding a fraction to the interest rate of the loan itself, saving the borrower from having to pay closing costs out of pocket.

- Rather than helping borrowers, YSPs developed into a way for a broker to receive double compensation from the lender and borrower.  In addition to the up-front fees, brokers were submitting loans for a higher-than-market rate and keeping the YSP, without the borrowers' consent.

16. Additionally, a fundamental characteristic of predatory lending is the aggressive marketing techniques used by lenders to secure the greatest quantity of loans as possible.  The reason for this is because the loan is underwritten on the basis of the liquidation value of the collateral, without regard to borrower's actual ability to perform on the loan.  In short, the

8

bank is looking to receive a commission on the sale of the loan, without regard to the strong

likelihood that the borrower will default and lose their home.

## B. The Foreclosure Crisis

17. As a result of the predatory lending practices referenced above, the United States has been

in a largely publicized foreclosure crisis. A congressional oversight panel recently noted

that one in eight U.S. mortgages are currently in foreclosure or default.[3]

18. California has been one of the worst states in terms of foreclosure rates, with 23% of all the

nation's foreclosures in the last quarter of 2009.[4]  In the past three months, 233,552

properties have received a foreclosure notice, and 50,935 homes have foreclosed and sit

empty as bank-owned.[5]

19. In 2009, nine of the top twenty cities in the country with the highest foreclosure rates were

in California.[6]   And this crisis is only increasing.  One in every 53 California homes is

facing foreclosure, up 18.6% since last quarter, and 39% since 2008.

20. Economists predict that the five to seven year fixed interest rates on the riskiest of lending

commodities undertaken by borrowers will not reach their zenith until sometime in 2011.[7]

## C. Congressional Response

21. In 2008, Congress passed the Emergency Economic Stabilization Act, and supplemented it

with the American Recovery and Reinvestment Act of 2009, both of which aimed to restore

---

3  Congressional Oversight Panel, Oct. 9, 2009 report at 3.  Available at
   http://cop.senate.gov/reports/library/report10090-cop.cfin.
4  Swanson, Jann Foreclosure Rates Soar in March. Ten States Account for Major Filings, Apr. 15,
   2010.  Available at http://www.clickondetroit.com/money/23156357/detail.html.
5  Realtytrac, U.S. Foreclosure Market Data By State; California, March 2010.  Available at
   http://www.realtytrac.com/foreclosure/foreclosure-rates.html,
6  Hoak, Amy, Highest Foreclosure Rate Last Year?, Jan. 28, 2010.  Available at
   http://www.marketwatch.com/story/the-20-cities-with-the-highest-foreclosure-rates-2010-01-28.
7  Tymoigne, Eric Securitization, Deregulation, Economic Stability, and Financial Crisis, Working
   Paper No. 573.2. Available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458408.

liquidity and stability to the financial system.  12 U.S.C.A. § 5201 *et seq.*(2009).  The Act directed the Secretary of the Treasury to ensure that the new stable financial system "protects home values" and "preserves homeownership."  The Act effectuated this by granting the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP.  12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions, including mortgage-backed securities

22.  Congress allocated $700 billion to the United States Department of the Treasury for TARP.  12 U.S.C. § 5225.  In exercising its authority to administer TARP, the Act mandates that "the Secretary shall take into consideration... the need to help families keep their homes and to stabilize communities."  12 U.S.C. § 5213(3).  The Act further mandates, in regards to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to encourage them to take advantage of programs to minimize foreclosures."  12 U.S.C. § 5219.  The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures."  *Id*.  Modifications may include "reduction of interest rates, reduction of loan principal, and other similar modifications."  12 U.S.C. § 5220.  The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  *Id.*

23.  On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.  The Making Home Affordable program consists of two subprograms.  The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable

Refinance Program, or HARP.  The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.

**D. The Federal HAMP**

24. The Treasury Department has thus far allocated at least $75 billion to HAMP.  The Supplemental Directives (SD) for HAMP state that the program is "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels."[8]

25. A mortgage is eligible for the HAMP if certain criteria are met.  Aside from criteria that require that the loan be a first lien mortgage originated before 2009, that the property be occupied, and it must be the borrower's principal residence; the borrower must document a financial hardship and the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

26. Once the participating servicer has determined a mortgage borrower's eligibility in the HAMP, the servicer must apply any and all modification steps until the borrower's monthly mortgage payment ratio is reduced to 31 percent of the borrower's monthly income.  These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if applicable), and providing a principal forbearance or principal reduction.  SD 09-01, pp 8-10.

27. Since its creation and implementation, HAMP is proving to be ineffective.  An April Making Home Affordable report stated that while an estimated 3,275,249 home loans were eligible for HAMP, less than 10%, only 299,092 homes, were in fact modified through the

---

8  HAMP, Supplemental Directive 09-01, April 2009.  Available at https://www.hmpadmin.com/portal/docs/hamp_servicer/sd0901.pdf.

program.[9]  The report also stated that the average "trial" period for modification was seven

months, more than twice the Federal guidelines of three months.

**E. Lender and Servicer Practices**

28.   As stated above, mortgage-backed securities are bought and sold repeatedly on the open

market.  The holding entity of the security typically has no interaction with the recoupment

of the debt itself.[10]  Instead, the security holders hire mortgage loan servicing companies.

The servicers recoup monthly mortgage payments from the borrower, and pass the income

to the current holder of the Note.  The servicers are compensated by a servicing fee founded

on a range of basis points of the outstanding principal balance.[11]

29.   As part of the arrangement, servicers are required to pass monthly payments to the

noteholder, *regardless* of whether or not the borrower has actually paid.  If the borrowers

are delinquent in their payments, the servicer is ultimately recouped for the advanced

payments from the trust account if, and when, the house is sold.  *Id*.  However, this results

in cashflow problems for the servicer.  If the servicer does not have enough liquid cash to

advance the payments, the servicer will have to borrow funds, at an added, non-recoverable

cost to the servicing company.  *Id.*

30.   In loan modification situations, borrowers who are in default are saved from foreclosure by

entering into a new agreement to repay with the lender.  This new agreement reinstates the

borrower's loan, and makes it impossible for the servicer to recoup the lost advanced

---

9   MHAP April Report, April 2010.  Available at http://www.financialstability.gov/docs/April
    %20MHA%20Public%20051710%20FINAL.pdf

10  Thompson, Diane E., Why Servicers Foreclose When They Should Modify, Oct. 2009, National
    Consumer Law Center, Inc.  Available at http://papers.ssrn.com/sol3/papers.cfm?
    abstract_id=1502744.

11  Mason, Joseph R., Mortgage Loan Modification: Promises and Pitfalls, Oct. 3, 2007.  Available at
    http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1027470.

payments and fees.  As such, it is starkly against the interest of the servicing company to comply with loan modifications.

31. Before the current housing crisis hit in the early part of the century, the banks had a policy to modify approximately 1% of their loan portfolio on a case-by-case basis. Typically, these "modifications" came in the form of either 1) a forbearance, or 2) a modification of the loan.

32. In forbearance situations, the servicers created a temporary hiatus of payments for the borrower.  This was only supplied in extreme circumstances, such as short term medical problems or unemployment.

33. Modifications of the entire agreement were only available if there was no foreseeable way that the borrower would ever be able to perform under the contract, and consisted of rate reduction, term extensions, principal reduction, and arrears forgiveness.

34. Approval of modifications is based on "investor guidelines," which are found in the pooling and servicing agreement of each mortgage loan pool.  Sample Pooling and Servicing Agreement – Loss Mitigation Table, attached hereto as **Exhibit 2**;[12]

35. The investor guidelines usually call for a cost/benefit analysis of modifying the loan, without specifics as to what may be considered.  The servicer can look at anything, such as fair market value of the house, foreclosure costs, and the subjective determination of whether the borrower will perform on the modified agreement.

36. The investor guidelines make it so all modification decisions are based upon the benefit it will provide to the noteholder, *not the borrower*.

---

12   Original, 367 paged Pooling and Servicing Agreement can be found at http://www.secinfo.com/dqTm6.21Kx.d.htm#k0yd.

37.   Currently, the need for modifications has gone from 1% of the lending institutions' mortgage portfolio, to 10-20%, representing a growth of about 1,000-2,000 percent.  *Id.* Additionally, preliminary data show that 35-40% of modified loans re-enter into default within the next two years.  As stated in the 2007 article depicting servicers' disinterest in loan modification, "the decision to modify a loan is not subject to oversight as is the decision to make the initial loan," and "even with income and qualification, loan modifications will not be applicable to all problematic borrowers."

38.   Recently, it has become public knowledge that servicers and lenders are taking an active stance against loan modification, regardless of the billions of dollars of TARP bailout money which has been funneled into the financial system.  Chief executive officer of JPMorgan Chase, David Lowman, argues that modifying loans goes against the "sanctity of contracts" and the borrower's "promise to repay" (which is curious, given the fraudulent and predatory origination of the contacts to begin with).[13]

39.   Bank of America, Wells Fargo, and Chase have gone so far as to return forwarded TARP funds, without interest.

## V. PLAINTIFFS' BUSINESS PRACTICES

40.   REZN8 was created to assist distressed homeowners in obtaining home loan modifications. Starting at the end of 2008 and beginning of 2009, REZN8 met with attorneys and brokers, and developed a system of submitting loans for modification.  The CEO at the time of incorporation was, and continues to be, ALI.

41.   First, the potential client contacts REZN8 via phone or email.  Then, by phone or email, a trained agent reviews REZN8's process, credentials, and fee structure with the potential

---

13 Nasiripour, Shahien <u>JPMorgan Chase Argues Against Mortgage Modifications, Citing Sanctity of Contracts</u>.  April 12, 2010, available at <u>http://www.huffingtonpost.com/2010/04/12/jpmorgan-chase-argues-aga_n_534898.html</u>.

14

client.  If the potential client shows further interest, a face-to-face meeting is scheduled between the agent and the client.

42. At this meeting, the client provides REZN8 with all their loan documents.  A forensic loan auditor sits with the client, and does a "flip-through" audit of their documents looking for any illegalities or irregularities in the loan documents.  Given the predatory nature of REZN8's clients' loans, many illegalities and irregularities are typically found in the loan origination documents. Examples of such include grossly overstated income, forced cash-outs of HELOCs, loan flipping, equity stripping, failing to enter into loan origination agreements, failing to give necessary upfront disclosures, failing to comply with Truth In Lending Act requirements, charging large yield spread premiums in addition to upfront fees, Elder abuse, inclusion of the income of a non-borrowing spouse, unexecuted IRS 4506-T Forms, and many others.

43. If the auditor finds any of the above-referenced violations, then REZN8 considers the client "qualified" for REZN8's services.  REZN8 approaches loan modification as settlement in light of potential litigation.  That is, REZN8 uses the threat of possible litigation over creditors' (or servicers') illegal contact as leverage in encouraging lenders to modify REZN8's clients' loans.

44. No state or federal statute or regulation sets any standards whatsoever for which clients are qualified for loan modification services.

45. The next step is for the forensic auditor to conduct a thorough comprehensive review of the loan origination papers, and document them in a 40+ page forensic audit report.  The results of the forensic audit are reviewed with the client.  Copies of two forensic audits are attached as **Exhibits 3 and 4**.

46. Next, REZN8 compiles a loan modification application.  Depending on the servicing institution, REZN8's underwriter gathers all the required documentation from the client, including but not limited to: pay stubs, profit and loss statements, income tax returns, property tax information, homeowner insurance, utility bills, bank statements, IRS tax form 4506-T, a hardship letter, and any supplemental application materials required by the lender.  The underwriter also creates a detailed income and expense sheet, highlighting the borrower's principal, interest, tax, insurance (PITI) payment and debt to income (DTI) ratio.  Finally, the forensic audit results are itemized and attached with the application.  A copy of a loan modification application is attached as **Exhibit 5**.

47. The application is then faxed to the lender's loan modification department and the underwriter calls to confirm receipt.  It takes lenders 3-4 days to confirm receipt of the 50+ page application.  It is REZN8's experience that if the application is not confirmed, the servicer may not submit the application to the negotiation department, or may delete the application altogether.

48. Servicers 'losing' the application during the submission process is a common occurrence.  A submitted application could be pending before the negotiator for weeks or months, and then randomly lost or deleted.  As such, REZN8 follows up on the application weekly.  Furthermore, certain lenders, like Bank of America, take so long in their process – up to 6 or 8 months – that documents such as pay stubs expire and need to be updated from the clients.  This creates a loss in confidence between the borrower and REZN8, even though it results from the servicer's guidelines.

49. Furthermore, certain servicers require the borrower to personally call into the modification department to authorize submission of the application, even though the borrower has executed a third party authorization agreement for REZN8.  This practice has become an

issue, as wait times to speak with a loan modification servicer can be upwards of an hour.  It was even confided by one former customer service representative at Wells Fargo, that they were instructed to answer a call, ask the client to hold, and then go to lunch.

50. For many borrowers, a significant reason behind hiring REZN8 is that the borrower does not have the ability to determine the violations that exist in their loan origination documents. Furthermore, the borrower does not have the ability to formulate the submission documentation required by their lenders.

51. Yet another reason is that the borrower does not have time to wait on the phone with the bank.  Requiring the client to submit the application over the phone is just another way the bank works to frustrate the home retention goals of the borrower.

52. Over the course of REZN8's business, it has become apparent that the servicers are developing a systemic policy of frustrating modification efforts.  Servicers call borrowers over the phone regardless of the instruction by the borrower to only speak to REZN8. Servicers ask borrowers questions about what was submitted – such as monthly income and expenses – and if the borrower is even a few dollars different then amounts supplied by REZN8, the application is denied, and months of work wasted.

53. In a few cases involving Chase, the servicer spoke with the borrower and negligently told REZN8's client that REZN8 was not working on a loan modification, and then REZN8 was trying to procure a refinance under their own license, to recoup a broker fee (this was not the case).

54. In regards to Aurora clients, once a third party authorization was filed, the servicer would cease supplying the client with their monthly mortgage statements, and instead mail the statements to REZN8.  REZN8 would then have to forward the statements to the client.

55. In one Bank of America case, a client was pending before their modification department for seven months.  During this time, REZN8 negotiator Sukhinder Kaur was following up weekly, and was repeatedly told that "nothing further was needed."  This was until approximately April 19, 2010, when the case was closed, because the client had filled out an IRS tax form 4506, instead of an IRS tax form 4506EZ, which had never been previously requested.  The application has been resubmitted, and it is unknown how long it will take for approval.

56. When a client finally receives a modification, the lender mails the proposed agreement to the borrower.  The modification always contains an acceptance deadline.  Upon receipt, the client brings the agreement to the REZN8 office for review with either the staff or outside counsel.  However, it has been REZN8's experience that the bank will claim that the modification was mailed to the borrower, and the borrower will either a) never receive it or b) not receive it in sufficient time prior to the deadline.  The servicer occasionally extends the deadline for acceptance, but this creates a "take it or leave it" aspect to modification.

**A. REZN8's Contract with Clients**

57. REZN8 has gone through several revisions of the contract under which it operates.

58. The contract, regardless of which version, specifies the duties of each party to the contract. In order to perform for its clients, REZN8 requires the cooperation of the client to the extent that they provide documents and update these documents upon request, follow REZN8's recommendations, and remain patient while REZN8 performs its duties.

59. The contract is signed by all borrowers to a loan. Each property requires its own contract, and REZN8 performs under each contract separately.

60. No instance exists where REZN8 has not performed the agreed upon services under the agreement between REZN8 and the client, where the client performs its contracted duties.

18

61. The original contract, utilized prior to the passing of SB 94, provided for a refund in cases where REZN8 is not capable of achieving a loan modification for its clients. Unfortunately, lenders, as explained above, do not cooperate even if a client has a hardship and are at risk of falling into default. This makes resubmissions vital to the loan modification process. So, under the previous contract, a refund would only be given if multiple resubmissions were made, with updated documents that accurately reflect the client's income and expenses, and utilizing a recommended outside attorney for the client's benefit, and none of these tactics yielded results.

62. Where a client fails to provide needed documents upon request, does not response within a particular timeframe, and/or communicates their intention to no longer work with REZN8, that client is held in breach of the contract and REZN8 no longer performs services on that client's behalf.

63. REZN8 sent its original advanced fee agreement for review to the DRE on February 27, 2009. A copy of the proposed advance fee agreement is attached as **Exhibit 6**.

64. A new advance fee agreement was drafted based upon sample advanced fee agreements posted on the DRE website. This agreement was submitted to the DRE for review on July 20, September 1, and September 25, 2009. The DRE did not respond to any of these submissions. A copy of this new agreement is attached as **Exhibit 7**.

65. The current contract used by REZN8 was rewritten by legal counsel, based on extensive research of SB 94. The contract was rewritten as a "performance agreement," where fees were to be accepted after contracted services were completed. On October 16, 2009, the redrafted performance agreement was submitted to the DRE for review. A copy of the Performance Agreement is attached as **Exhibit 8**.

66. To date, REZN8 continues to be a licensee of the DRE in good standing.

19

## B.  Denials and Resubmission

67.  If a client was initially denied a modification, the servicer would ubiquitously state "it was against investor guidelines."  REZN8 has pulled the PSA for many properties to consult the investor guidelines; however all are ambiguous at best.  This creates little predictability in the modification application process.

68.  Additionally, a common practice employed by lenders to deny home loan modifications was to make an arbitrary determination that the borrower has more income or assets than the lender guidelines allowed.  This was frequently the case for ARMs, where the payment had not adjusted yet, and the client was being proactive.  The client would then have to wait until the payment adjusted and was no longer affordable.  However, then, the same lender would deny the modification, because the borrower did not have *enough* money.

69.  REZN8 remedies denials based upon the reason for denial, either by asking the client to rent out portions of their homes or obtain and document contributions by family members or friends to better fit the arbitrary lender guidelines, or to otherwise encourage the thorough documentation of expenses which likely were not properly taken into consideration.  It was found that an application could be approved with a variation of income as little as $50.00.

70.  Also, REZN8 submits the application to different modification departments.  Different avenues available to the client included;

    a.      Federal Home Affordable Refinance Program (if qualifications are met)

    b.      Federal Home Affordable Modification Program (if qualifications are met)

    c.      Servicers' In-House Modification Program (for all clients)

    d.      Servicers' Imminent Default Departments (for clients not yet in default)

    e.      Servicers' Loss Mitigation Department (for clients exploring litigation)

71. REZN8 found that many clients, who are initially denied, are eventually approved on subsequent submissions.  This is because of additional income variables, or by submitting the application to different departments.  Unfortunately, this too creates a loss in confidence by clients, as approval could come after months of resubmission.

72. When an application is repeatedly denied or is pending before a bank for months without any progress, REZN8 consults an outside attorney in furtherance of their client's modification. The attorney takes the forensic audit conducted on the property, and drafts a lengthy legal demand letter.  This is then sent to the legal department of the lender, and oftentimes results in a prompt response by the servicer.  A copy of one example legal demand letter sent out by RAUFF is attached hereto as **Exhibit 9**.

73. In one case with ResMae/Bridgefield, the client's loan modification application had been denied twice, the last submission pending for six months before it was denied on March 3, 2010.  The client thereafter contracted with RAUFF to pursue litigation based upon REZN8's recommendation, and RAUFF drafted a legal demand letter based on the client's forensic audit.  On March 22, 2010, less than three weeks later, the client achieved a modification.

74. Upon a denial, REZN8 attempts to explain the reason for denial with the client, and discusses the client's options, including contacting the outside attorney for negotiations and legal demand, or perhaps filing litigation against the lender.

75. On a case-by-case basis, REZN8 may determine it is necessary to pay for the litigation on the clients' behalf, to effectuate a loan modification under the contract.

**C. REZN8 Client Examples**

76. REZN8 has had many successful clients by using the above-described process of submission.

77. REZN8 Client Gilbert M. Belile had a pick-a-pay negative amortization ARM loan with Wachovia.  Belile is retired and disabled, and receives a fixed income from Social Security and his Pension.  A variable rate mortgage meant that he was in almost certain risk of losing his house, as his income was fixed.

78. REZN8 submitted Belile's modification application in January 2010, and it was rejected in March, 2010.  The application was resubmitted, and Belile received a permanent modification on April 3, 2010.  The modification called for an initial interest rate of 2.8%, and it will increase 0.5% every year until it caps at 6.5% for the duration of the loan, and extended the term of the loan for 40 years.  Total savings over the course of the loan for Belile is $236,129.64.  Exact breakdown of Belile's modification is attached hereto as **Exhibit 10**.

79. REZN8 Client Richard Dooley had an ARM loan with Wells Fargo, with a monthly principal, interest, taxes and insurance (PITI) payment of $1,968.58.  With the economic downturn, Dooley had suffered a pay-cut at work, and could no longer afford his payments. He was seriously considering just walking away from the property, or selling it in a short sale.

80. REZN8 submitted his application three different times.  On October 6, 2009, Wells Fargo granted Dooley a forbearance, reducing his monthly PITI **$20.00**.  REZN8 resubmitted the application and was denied months later.  REZN8 resubmitted the application again, and achieved a modification for Dooley in February 2010.  Dooley's new monthly payment had a 3.875% interest rate for five years, increasing to 4.875% for one year, and then capping at 5% for the life of the loan.  Total savings for Dooley over the life of the loan is $61,480.20. Exact breakdown of Dooley's modification is attached hereto **Exhibit 11**.

22

81. REZN8 Client Mohanlal Dhar had a ten-year interest-only mortgage with Bank of America, at a 6.375% interest rate. He was promised he could refinance within a couple of years, so that he could be paying principal *and* interest, however, with the crashing housing market, he could not.

82. Dhar applied for a modification on his own in February or March of 2009. After the application was pending before Bank of America for six months, it was denied. In September 2009, Dhar contracted with REZN8 for the a loan modification. REZN8 received a loan modification for Dhar two months later. Dhar's new agreement was paying principal and interest for the course of his loan, at 3.875% interest for five years, and 6.375% interest thereafter for the course of the loan. Total savings for Dhar was $127,581.00. Exact breakdown of Dhar's modification is attached hereto as **Exhibit 12**.

83. REZN8 Client Maya Bali had a interest-only mortgage with Wells Fargo, and contracted with REZN8 in the early part of 2009. Her monthly payment was $2,374.58.

84. The file was denied in June, 2009, resubmitted in August 2009, denied in November 2009, and resubmitted against finally in February 2010. REZN8 received a modification for Bali on March 16, 2010. Her new principal and interest payment is $2,168.10 a month. Exact breakdown of Bali's modification is attached hereto as **Exhibit 13**.

85. REZN8 client Anthony Welch had a loan with GMAC mortgage with a monthly payment of $2,494.90, at a 5.88% interest rate. REZN8 first submitted the loan modification in mid 2009, and was denied on October 27, 2009. REZN8 resubmitted the application, and received a modification for Welch in January, 2010. Welch's new monthly payment is $1925.07. Exact breakdown of Welch's modification is attached hereto as **Exhibit 14**.

86. Additional information on clients who would have lost their home, but for REZN8 obtaining a loan modification for them, is attached hereto as **Exhibit 15**.

**D. REZN8 Full Client List**

87. To date, REZN8 has accepted four hundred and one (401) clients.  An UPDATED detailed breakdown of the current status of all of REZN8's clients is attached hereto as **Exhibit 16**.

88. Of these, one hundred (100) have received loan modifications, providing to the borrowers in many cases savings as high as $500,000.00 over the lifetime of their modified loan.

89. Fifty-one (51) clients have decided to cancel their services and received a refund.  The typical canceling client discontinues REZN8's services due to the timeliness of the process or a change in situation such as obtaining a new job and no longer wanting a loan modification.

90. One hundred and three (103) clients are still in submission with the lender, and are still being actively pursued.

91. Of these clients still pending, eighty-nine (89) have contracted with outside counsel RAUFF to pursue litigation, and are currently involved in active civil lawsuit.

92. Twenty-one (21) are unsatisfied clients, who are refusing to work with REZN8, in pursuit of their loan modification goals.  In all of these cases, the client has refused to continue to work with REZN8, and will not provide necessary documents to move forward, not agree to resubmission of the application, and will not agree to consult the attorney.  The clients unfortunately lose sight of the reason for contracting with REZN8 in the first place – to achieve a modification of their mortgage, to help them stay in their home.  This is all the result of systemic efforts by the servicers to fight modifications, and the "badwill" perpetuated against loan modification companies, by people like MONGE.

93. Regardless, REZN8 makes every effort to resolve any issues its clients may have.  Copies of dispute resolution letters are attached hereto as **Exhibit 17**.

94.   These same detailed statistics regarding the above categories of information as of March 19, 2010, were provided to MONGE.

## VI. PLAINTIFFS' GOOD FAITH COOPERATION WITH INVESTIGATIONS OF CALIFORNIA STATE AGENCIES

### A. REZN8's Compliance with Regulatory Agencies

95.   On or about February 26, 2009, at the direction of Omari Miller, a broker, and Carl Durham, an attorney, REZN8 submitted an application to the California Department of Real Estate (DRE) for its corporate broker license under Omari Miller.  This application was resubmitted on or about April 23, 2009.  No response was issued by the DRE.

96.   On or about March 17, 2009, Deputy Commissioner of the DRE, Stephanie Yee, visited the REZN8 office, at which time she was consulted regarding the business practices of REZN8, including the sales, modification, and negotiation processes.  Ms. Yee did not object to any practices going forward.

97.   Upon Omari Miller leaving REZN8 due to financial reasons, on or about May 15, 2009, REZN8 hired Raul F. Samson to take over as REZN8's licensed broker.  About this time, documentation was submitted to the DRE to change brokers under REZN8's corporate license, however this application was rejected due to the DRE not processing the corporate license application submitted by Omari Miller.

98.   Upon the rejection of Raul Samson's application to change brokers under REZN8's corporate broker's license, on or about June 16, 2009, REZN8 applied for its corporate broker license under Raul Samson.  This application was resubmitted on September 10, 2009, based upon a response stating that the DRE required more documentation.  REZN8's corporate broker's license was accepted on or about September 16, 2009.  A copy of the

DRE website record of licenses of Raul Samson and REZN8 are attached hereto as **Exhibits 18 & 19**.

99. On October 11, 2009, Senate Bill 94 (SB94) was passed, which aimed to curtail the occurrence of fraudulent Home Loan Modification companies, and did so, in part, by regulating advanced fees.

100. In light of the bill, REZN8 hired outside and inside legal counsel, as well industry expert attorney Edward Lear, and other attorneys Melissa Bash, Floyd Frisch, Arianna Downing, and Catherine Walker, to review this new bill as well as REZN8's business practices as they relate to SB94.

101. On or around the first of December, 2009, resident broker, Raul Samson, left America to attend nursing school in the Philippines.  Since this time, Samson continues to work with REZN8 via email and phone on a weekly basis.

102. Sometime in February, 2010, DRE commissioner Yee contacted Samson, regarding the audit of the business.  At this time, Samson informed Yee that he was telecommuting with REZN8 from the Philippines.  This concerned Yee, and she informed Samson that REZN8 needed to have an on-site broker.  Samson conveyed this information to REZN8.

103. On or around March 2, 2010, a letter and phone call was made by Frisch to Stephanie Yee, Deputy Commissioner at the DRE. The goal of this communication was to address any and all concerns which may be had by the licensing agency under which REZN8 operates. Immediately, a meeting was set for March 4, 2010, between Yee, Frisch, and the corporate business managers Ed Chui and Hilai Hassani. A copy of the correspondences memorializing such are attached as **Exhibit 20**.

104. On March 4, 2010, officers of REZN8 met with Yee and two members of Yee's staff. At such time, Yee expressed concerns about the previous contract and its compliance with

26

SB94. Yee was informed that the contract has since been abandoned, and the new performance agreement has been submitted to the DRE for review.

105. Yee also advised REZN8 to register as Rezn8 Systems Inc. DBA Rezn8 Financial, under the DRE Corporate License. Immediately thereafter, REZN8 resubmitted the license, listing the DBA.

106. During the meeting, Chui asked Yee, "going forward, do you have any concerns with our business practices, that we have the ability to do or correct?"  Yee replied that she had no concerns other then the issues discussed above.

107. Immediately thereafter, REZN8 began working with broker Joachim Buth.  Buth reviews files at REZN8 twice a week, and currently lists REZN8's address under his broker license. This information was supplied to Yee.  Buth submitted an application to the DRE as REZN8's associate broker, with was approved by the DRE March 17, 2010.  A copy of the DRE website record of license of Buth is attached hereto as **Exhibit 21**.

## VII.  DISTRICT ATTORNEY'S INVESTIGATION

108. On February 8, 2010, MONGE and Pat Johnson of the Alameda County District Attorney's office met with ALI and Ed Chui, general manager of REZN8, at the place of business of REZN8.

109. At this meeting, MONGE expressed concerns about the legitimacy of the business of REZN8.  ALI and Chui explained the business practices of REZN8 in great detail, much of which was focused on REZN8's qualification standards, resubmission of client files, and collecting post-dated checks.  REZN8 explained all business practices of REZN8 as detailed in the above section entitled "Business Practices of REZN8."

110. At the end of this meeting, MONGE was provided a copy of the performance agreement, as well as a full client list.  ALI invited MONGE to take a look around the office and speak

with REZN8's forensic auditor or other employees of REZN8, but MONGE refused.  ALI also offered to supply MONGE with a copy of a forensic audit prepared for the purposes of obtaining a loan modification on behalf of REZN8 clients, which he also refused.

111. On March 15, 2010, a meeting was set up between ALI, Frisch, and the Alameda County District Attorney's Office (DA).  In attendance were DA Office Inspectors MONGE and Kristine Milani.

112. During the meeting, MONGE expressed three concerns:

    a.  That REZN8 was taking "unqualified" clients.

    b. That REZN8 was not providing refunds to clients who were denied a loan modification.

    c.  That REZN8 was taking advanced fees.

113. In regards to client qualification, ALI informed MONGE that REZN8 approaches loan modification as settlement in light of potential litigation.  As such, REZN8 does a comprehensive forensic audit on the loan documents of the clients.  If there are any illegalities or irregularities of the loan documents, REZN8 will accept the client, and demand a loan modification from their lender, based on the claims.

114. In regards to the issuance of a refund, ALI informed MONGE that it has been REZN8's experience that a loan modification, which is initially denied, can be approved on subsequent submissions based upon increasing income, or clarifying expenses, or to send to additional modification departments.  This information was surprising to MONGE.  ALI informed MONGE that many of REZN8's clients have received successful modifications this way.  As such, REZN8 does not supply its clients with a refund until the application has been re-submitted with all possible lender objections having been exhausted, all legal

options have been reviewed, and REZN8 feels that there was no possible way of obtaining a loan modification for its clients.

115. ALI and MONGE consented to an arrangement whereby if REZN8 can supply MONGE with clients in which multiple submissions resulted in a modification or a refund, MONGE would "walk away" from the investigation.

116. In regards to advanced fees, MONGE felt that the acceptance of post-dated checks and automated ACH transfers was taking advanced fees. ALI informed MONGE that the contract between REZN8 and its clients provided for payment upon completion of specified services in each phase of the modification process and that funds only changed hands upon completion of the agreed upon services for each phase. ALI further informed MONGE that this is a legal issue which has been researched, and that there was no authority or other legal basis for determining that these were "advanced payments." Regardless, REZN8 stopped accepting post-dated checks.

117. On March 19, 2010, a letter was sent to the DA, memorializing the meeting held between inspector MONGE, ALI, and Frisch. The correspondence included specific examples of clients whose loan modification request was rejected initially but accepted on a later submission, as well as a full accounting of how many clients have been modified and refunds issued. A copy of the correspondence is attached as **Exhibit 22**.

118. On April 1, 2010, an additional correspondence was sent to MONGE which provided updated proof of clients whose loan modification request was rejected initially but accepted on a later submission, as well as news articles outlining the loan modification business, about how lengthy and complicated a process it is, and how lenders are doing everything in their effort to frustrate home loan modifications. A copy of the letter and news articles is attached as **Exhibit 23**.

119. REZN8 and its representatives repeatedly offered to provide MONGE with additional information regarding its business practices and its often-successful efforts in assisting its clients in keeping their homes.  REZN8 likewise offered to make available numerous employees for MONGE to interview.  MONGE declined all such offers, instead choosing to ignore all exculpatory information and to focus solely on limited facts, taken out of context, that allowed him to infer wrongdoing by REZN8 and/or ALI.

120. Further, REZN8 informed MONGE that the DRE had investigated many aspects of its business practices and had found no violations.  Although the DRE had been aware of isolated complaints by dissatisfied former clients of REZN8 (specifically, Mr. Branzuela and Mr. Adler), Ms. Yee's only concern related to the need for an on-site real estate agent; as REZN8 tried to explain to MONGE, that concern had been resolved to the satisfaction of the DRE.  MONGE chose to disregard the conclusions of the DRE.

121. REZN8 provided MONGE with information regarding services provided to Mr. Branzeula and Mr. Adler, the two former clients whose complaints had given rise to his investigation. REZN8 explained that neither client had been entitled to a refund under the contract with REZN8 because the clients – and not REZN8 – had breached the agreement.

122. REZN8 further informed MONGE that, although REZN8 maintained its position that neither of the two complaining former clients were entitled to a refund, REZN8 offered to pay a partial refund to Mr. Branzuela and Mr. Adler, in a good faith effort to resolve each respective dispute.

123. Despite the fact that the only evidence MONGE had of any possible wrongdoing by REZN8 were a couple isolated complaints by two clients who had not received a refund, MONGE continued ignoring exculpatory evidence and persisted in his investigation.

124. Plaintiffs are informed and belief, and thereon allege, that MONGE'S wrongful conduct was performed under the direction and supervision, and with full ratification, by O'MALLEY and BELTRAMO. Plaintiffs are informed and believed that O'MALLEY and BELTRAMO directed MONGE to continue his investigation despite the lack of evidence of wrongdoing, and despite extensive exculpatory evidence.

125. One April 6, 2010, MONGE was issued a search warrant by the Alameda County Hayward Hall of Justice Magistrate. A copy of the Search Warrant and Affidavit is attached hereto as **Exhibits 24 & 25**.

126. In the search warrant affidavit, MONGE deliberately, and with reckless disregard for the truth, misrepresented the facts and omitted material facts in order to mislead the magistrate. The search warrant affidavit omits and misrepresents the following:

   a.     Omits the fact that the contracts for services of Mr. Adler and Mr. Branzuela were entered prior to the enactment of SB 94, ***before*** the acceptance of an advanced fee was restricted.

   b.     Omits the fact that, at the February meeting between MONGE and REZN8, REZN8 explained to MONGE the detailed process that REZN8 employs to qualify a client for REZN8's services.

   c.     Omits that REZN8 currently utilizes the services of two brokers, Raul Samson and a local broker, Joachim Buth. Buth visits REZN8's place of business and reviews client files with REZN8 staff multiple times during the week, which was explained by REZN8 to MONGE.

   d.     Omits the fact that REZN8 is and has always been a licensee in good standing with the DRE.

   e.     Omits the fact that REZN8 supplied defendants, at length, evidence of 1) REZN8's business practices, 2) extensive examples of clients with modification or who had been supplied refunds, and 3) the complicated business of loan modifications.

   f.     Omits the fact that MONGE, or another agent of Defendants, has contacted at least one previous client of REZN8, Rash Pal Aulakh, who has received a refund from REZN8.

g.     Omits the fact that MONGE, or another agent of Defendants, has contacted at least two previous clients of REZN8, Stephen Fields and Rash Pal Aulakh, who informed him that REZN8 did not represent itself to advertise its services as attorney-represented.

h.     Misrepresents that REZN8 has engaged in practices that the DRE does not condone, when, in fact, no disciplinary action has been taken against REZN8.  REZN8 is still in good standing with the DRE.

i.     Misrepresents the fact that the DRE was also provided with explanations regarding clients Branzuela and Adler, that the DRE investigated these claims, and that the DRE took no disciplinary action.  MONGE states in his affidavit that he fully discussed these matters with the DRE; by seeking the search warrant, MONGE unreasonably ignored this exculpating evidence.

j.     Omits significant amounts of information regarding REZN8's business provided in letter form to MONGE, including rigorous details regarding the qualification process prior to accepting clients, specific numbers regarding the number of clients modified, REZN8's success upon resubmissions, the number of refunds already issued, the current strategy of REZN8 in filing a lawsuit and the basis for such a filing, and the current landscape of the loan modification industry which REZN8 feels justifies this course of action.  MONGE admitted to having this information provided, however completely omits the details of what is stated in this information.

k.     Misrepresents facts presented by REZN8 and its officers are untruthful based solely upon his "experience and training", even though all information discussed in MONGE's two meetings with REZN8 officers were either supplemented and/or clarified in later communications by REZN8.

l.     Omits any basis, aside from MONGE's "experience and training," to have the search warrant include the personal residence of ALI.

127. In a continuing effort to cooperate fully in the investigation, on April 7, 2010, Smyth contacted MONGE, inquiring as to any additional information that the DA required. MONGE stated that he had received, but still not read, the second correspondence sent on April 1.  MONGE requested an updated client list, to which Smyth agreed to look into in furtherance of REZN8's good faith attempts to inform MONGE as to REZN8's business practices.  Smyth asked if there were any additional things MONGE required, or if MONGE had any questions, to which he replied "no."

128. On April 8, 2010, MONGE executed the search warrant and seized the business materials of REZN8, ALI, and RAUFF.

129. In performing his investigation, MONGE and the other Defendants' conduct demonstrates arbitrary,  capricious, malicious and prejudicial intent by:

- Deliberately disregarding offers by REZN8 and ALI to make available REZN8's staff to discuss REZN8's practices and loan modification procedures.

- Deliberately declining to accept forensic audits and other files that would help to explain REZN8's practices.

- Deliberately disregarding the information in the contract provided to MONGE during the February meeting.

- Deliberately disregarding REZN8's explanations of compliance with the DRE's rules and regulations regarding REZN8's contract and broker's license.

- Deliberately disregarding explanations provided regarding former clients Branzuela and Adler and REZN8's attempts to work with these clients, and attempts to resolve issues with their files, which also was explained to the DRE.

- Deliberately disregarding REZN8's explanations as to REZN8's use of outside counsel to help REZN8's clients to achieve a loan modification.

- Overstepping his authority by attempting to criminalize conduct that is within the purview of the Department of Real Estate.

- Ignoring REZN8's attempts to inform MONGE in regards to the landscape of the loan modification business, which REZN8 explained is an essential component to understanding the business practices currently engaged in by REZN8.

## VIII. DEFENDANT'S UNCONSTITUTIONAL ACQUISITION OF SEARCH WARRANT.

130. On April 5, 2010, MONGE was issued a search warrant at both the business of REZN8, and the private residence of ALI. The search warrant alluded to probable cause to seize:

1. "Property or things used as the means of committing a felony;

2. Property or things in the possession of a person with the intent to use it as means of committing a public offense, or in the possession of another to whom he may have delivered it for the purpose of concealing it or preventing it being discovered;

3. Property or things that are evidence that tends to show that a felony has been committed, or tend to show that a particular person has committed a felony."

131. The search warrant was accompanied by an affidavit by MONGE which is rife with material misrepresentations, omissions, and improper assertions of alleged criminal activities which are not, in fact, criminal.

132. In regards to improper assertions of alleged criminal conduct, more specifically, MONGE's affidavit in support of the search warrant mislead the magistrate by:

a. Wrongfully asserting that a criminal standard for qualifying potential clients exists, and failing to prequalify potential clients according to such criminal standard constitutes a felony, when no such criminal law, or qualification standard, does exist. Simply having a deed of trust could permit a loan modification for a homeowner.

b. Wrongfully asserting that the act of resubmitting files under section 487(a) could be fraudulent, even after proof of successful loan modifications after resubmission had been provided.

34

    c.   Wrongfully asserting that Plaintiffs were not disclosing to its clients certain material facts, in furtherance of some "deceptive scheme," when in fact no duty to disclose existed in the arm's-length transaction.

    d.   Wrongfully alleging that having an advanced fee agreement prior to October 11, 2009, without the approval of the Commissioner of the Department of Real Estate, constitutes criminal conduct in of itself, when no such criminal law does exist or existed at any point during the period in which REZN8 has conducted business.

    e.   Wrongfully alleging that a potential conflict of interest in regards to attorney representation is criminally culpable conduct.

    f.   Interprets "advanced fees" to include post-dated checks, without any legal basis other than "articles", and after being informed that REZN8 has done extensive research into this issue and not found any legal conclusions stating as much.

133. Plaintiffs are informed and believed, and thereon allege, that O'MALLEY and BELTRAMO instructed MONGE to pursue an investigation and a search warrant based upon the wrongful assertions and interpretations set forth in paragraph 134.  Plaintiffs further allege on information and belief that O'MALLEY and BELTRAMO did so despite knowing that their theories were not supported by the law and with reckless disregard for the truth (i.e., for the extensive exculpatory evidence discovered during MONGE's investigation).

134. The search warrant is filled with misrepresentations and omissions of material facts which have mislead the assigned magistrate to approve the search warrant as to REZN8's place of business and ALI's personal residence.  In particular, MONGE's affidavit:

    a.   Omits the fact that the contracts for services of Mr. Adler and Mr. Branzuela were entered prior to the enactment of SB 94.

b.   Omits all details from the February meeting between MONGE and REZN8, in which REZN8 explained to MONGE the detailed process that REZN8 utilizes in order to qualify a client for REZN8's services and MONGE.

c.   Omits that REZN8 currently utilizes the services of an associate broker, Joe Buth, who visits REZN8's place of business and reviews client files with REZN8 staff multiple times during the week, which was explained to MONGE by REZN8.

d.   Omits the fact that REZN8 is in good standing and fully licensed with the DRE.

e.   Omits the fact that MONGE, or another agent of Defendants, has contacted at least two previous clients of REZN8, Stephen Fields and Rash Pal Aulakh, one of whom had received a refund from REZN8.

f.   Omits the fact that MONGE, or another agent of Defendants, has contacted at least two previous clients of REZN8, Stephen Fields and Rash Pal Aulakh, who informed him that REZN8 did not represent itself to advertise its services as attorney-represented.

g.   Misrepresents that ALI provided false statements by telling MONGE that the in-house attorney of REZN8 "reviews files", when, in fact, MONGE admitted in his affidavit that REZN8's officers explained the current job description for the in-house attorney to not include reviewing files for modification purposes, but only for other issues.

h.   Misrepresents that Floyd Frisch agreed with MONGE that having an outside attorney under retainer for both REZN8 and REZN8's clients creates a conflict of interest when, in fact, Mr. Frisch simply cautioned that a potential conflict of interest could exist.

i.   Further omitted any of the detailed information provided to MONGE by REZN8 regarding how a conflict of interest in having an outside attorney under retainer by

36

both REZN8 and REZN8's client did not violate any rules of professional conduct for attorneys and that REZN8 avoids this by disclosing the potential conflict to clients.

j.   Omits the fact that, at several points in time, REZN8 has hired in-house attorneys to write qualified written requests and perform other loan modification services at no extra cost to clients.

k.   Misrepresents that REZN8's normal practice of hiring in-house attorneys or outside counsel for the purpose of performing legal services should create suspicion of fraudulent intent.

l.   Misrepresents to the magistrate that Michael Lubofsky, who was employed by REZN8 for less than two weeks, "never saw evidence that REZN8 had produced anything for their clients", even though REZN8 already explained to MONGE that a loan modification typically requires months to achieve.

m.   Misrepresents to the magistrate that Charlene Coscarelli, a sales representative employed for less than one month, "did not have any independent knowledge that any clients actually ever had a mortgage loan modified", after REZN8 already explained the roles of REZN8's staff to MONGE such that he should have understood that a sales representatives does not engage in the loan modification process.

n.   Misrepresents to the magistrate that Kelly Nielsen, a former employee of REZN8, made reliable statements that ALI was engaged in fraudulent practices, even though these statements were made in May, 2009, to Stephanie Yee of the DRE, and which the DRE did not take any disciplinary action as against REZN8, and came from two-degrees of hearsay.

o.   Misrepresents that REZN8 has engaged in practices that the DRE does not condone, when, in fact, no disciplinary action has been taken against REZN8.

p.   Omits significant amounts of information regarding REZN8's business provided in letter form to MONGE, including rigorous details regarding the qualification process prior to accepting clients, specific numbers regarding the number of clients modified, REZN8's success upon resubmissions, the number of refunds already issued, the current strategy of REZN8 in filing a lawsuit and the basis for such a filing, and the current landscape of the loan modification industry which REZN8 feels justifies this course of action.  MONGE admitted to having this information provided, however completely omits the details of what is stated in this information.

q.   Misrepresents facts presented by REZN8 and its officers are untruthful based solely upon his "experience and training", even though all information discussed in MONGE's two meetings with REZN8 officers were either supplemented and/or clarified in later communications by REZN8.

r.   Omits to provide any basis, aside from MONGE's "experience and training", to have the search warrant include the personal residence of ALI.

135. On May 14, 2010, counsel for the parties appeared before the Honorable Roy Hashimoto, the Alameda County magistrate who issued the search warrant.  Judge Hashimoto had conducted an in camera review of some of the files seized from Plaintiffs to determine whether any should be returned to RAUFF, on the grounds that they contained attorney-client privileged information.

136. Following this in camera review, Judge Hashimoto stated, on the record and in open court, that – far from containing evidence of criminal misconduct – the files contained compelling evidence of the "extraordinary efforts" REZN8 undertakes on behalf of its clients. According to the magistrate, Defendants likely had evidence of only one or two "complaining clients" and that Defendants should try and make available all of Plaintiffs'

files, so that they can be go back to working hard, trying to procure loan modifications for their clients.  The Magistrate than recused himself from any further proceedings.

### IX. DEFENDANTS' UNLAWFUL SEARCH AND SEIZURE.

137. The warrant's broad scope allowed the Defendants and any officers under the direction of Defendants to take anything and everything that they wanted, without regard to the crimes being alleged and how the property being seized is evidence of such criminality.

138. During the execution of the warrant, several constitutional guarantees and other rights were violated by Defendants. Specifically:

   a. Defendants executing the search warrant at ALI's personal residence refused to provide a copy of the warrant upon multiple requests by ALI and his family members. Only upon completion of the search and seizure did Defendants provide a copy of the warrant.

   b. Property was seized that did not fit within the scope of the search warrant.

   c. Documents were seized from both ALI's personal residence and REZN8's place of business that were protected by the attorney-client privilege.

139. Defendants unlawfully seized many possessions of REZN8, ALI's personal property, and other Attorney-client privileged documents of RAUFF.

140. Upon execution of the search warrant at the residence of ALI, items seized included:

   a. The personal identification cards of ALI.

   b. The personal credit cards of ALI.

   c. The cell phone of ALI.

   d. All blank business and personal checks of ALI.

   e. The personal computer of ALI's son, Wahajat Ali.

   f. Box of CSI files marked 2005 (CSI is a different business unrelated to REZN8).

g.   And other items yet to be discovered.

141. All items seized are referred hereinafter as "ALI's personal belongings."

142. Defendants also took a money order belonging to ALI's son, Wahajat, and tossed it in a pile of miscellaneous rubbish to which ALI only found when he was throwing them away.

143. Upon execution of the search warrant at REZN8's place of business, items seized included:

a.   All but two computers.

b.   All servers, which includes, in part, information regarding fifty-four (54) clients who have already entered into an attorney-client agreement with outside litigation counsel, RAUFF.

c.   Seventeen (17) client files, including files still pending, and including original documents.

d.   Seven (7) files for which the client has already entered into an attorney-client agreement with outside litigation counsel, RAUFF.

e.   Files labeled, "Chris Cannon legal files,", "mortgage payments," "court declarations", "court payments,"  and other miscellaneous legal files clearly labeled as ALI's legal documents containing attorney-client privileged communications unrelated to REZN8.

f.   And other items yet to be discovered.

144. All items seized are referred hereinafter as "business materials."

## X. CURRENT SITUATION AND FURTHER MALICIOUS TACTICS BY INVESTIGATORS

145. Defendants have been in possession of seized business materials and personal property for days since the date the original Complaint was filed, and MONGE has indicated that REZN8 and ALI will not be receiving their possessions back any time soon.

146. Throughout the investigation, Defendants have made statements to REZN8's current clients to the effect that REZN8 is engaged in criminal conduct, without any such conviction or court conclusion stating as much.  Such statements have caused many of REZN8's clients to disengage communications and cease cooperating along the terms of REZN8's contract.  A true and correct copy of the correspondence sent by MONGE to REZN8 clients is attached hereto as **Exhibit 26**.

147. At the REZN8 place of business, Defendants turned away two clients, Marc Brown and Gustavo Cerna, who were bringing their approved modifications into REZN8 for review. The clients were told by Defendants that REZN8 was a fraudulent operation and it was being shut down.  To date, these clients will no longer return REZN8's calls, nor pay REZN8 for the services rendered.

148. REZN8 has made every effort to comply with any and all state and federal statutes, as well as DRE regulations, while maintaining a business and assisting its four hundred and one (401) former and current clients in obtaining a home loan modification.

149. To date, REZN8 has successfully obtained a home loan modification for one hundred (100) clients, at an estimated savings of $500,000.00 (five hundred thousand dollars) to several of its clients over the lifetime of the loan.

150. As a direct result of the over-broad and unfounded search and seizure conducted against ALI and REZN8, Defendants have put in jeopardy as many as one hundred and three (103) clients whose files are still pending with their respective lender.  Of these clients, at least five (5) have fallen into default and are in direct risk of foreclosure due to the unconstitutional search and seizure conducted by Defendants.

151. Based on the effort by REZN8 and ALI to be in full compliance with the law and all regulatory agencies, it can only be presumed that the raid on REZN8 and ALI is the result

of some sort of malicious actions against ALI, REZN8, and home loan modification companies in general.

152. RAUFF, REZN8 and ALI have tried to contact the appointed Deputy DA, Matt Beltramo (BELTRAMO), in regards to this matter and in regards to the return of attorney-client privileged documents, as well as other personal possessions of ALI, however all their requests have gone unanswered.  A copy of one request faxed to BELTRAMO is attached as **Exhibit 27**.

## FIRST CAUSE OF ACTION

**42 U.S.C. § 1983:  Violation of the Unlawful Search and Seizure Clause of the Fourth Amendment and Fourteenth Amendment**

**(As to all Plaintiffs as Against All Defendants in Their Official Capacities)**

153. Plaintiffs re-allege and fully incorporate by reference the allegations of Paragraphs 1 through 152 of this Complaint as though fully set forth herein.

154. Defendants have violated the Plaintiffs' Constitutional guarantee against unlawful search and seizure by improperly seeking and obtaining a search warrant.

155. Defendants received the issued search warrant under the misrepresentation that:

a.  A criminal standard for qualifying potential clients exists, and failing to prequalify potential clients according to such criminal standard constitutes a felony, when no such criminal law or qualification standard does exist. In fact, the simple act of having a deed of trust could permit a loan modification for a homeowner.

b.  The act of resubmitting files under section 487(a) could be fraudulent, even after proof of successful loan modifications after resubmission had been provided.

c.   That Plaintiffs were not disclosing to its clients certain material facts, in furtherance of some "deceptive scheme," when in fact no such disclosures were statutorily or contractually mandatory or necessary.

d.   Wrongfully alleging that having an advanced fee agreement prior to October 11, 2009, without the approval of the Commissioner of the Department of Real Estate, constitutes criminal conduct in of itself, when no such criminal law does exist or existed at any point during the period in which REZN8 has conducted business.

156. The search warrant violated the Plaintiffs' Constitutional guarantees because:

a.   The search warrant was vague as to what crimes are being investigated.  Search Warrant, Pg 1 LNS 13-17.  As such, it allows Defendants the unfettered discretion to seize any and all documents and things located at all locations.

b.   There was no probable cause for the issuance of the warrant, as it relates to the place of business of REZN8.  Search Warrant, Pg 1 P24-27.

c.   There was no probable cause for the issuance of the warrant, as it relates to the personal residence of ALI.  Search Warrant, Pg 1 P27 – Pg 2 P2.

d.   The search warrant was issued for the personal residence of ALI with disregard to heightened standards required for the search of a homestead, and without specifying facts leading to probable cause that REZN8 conducts business from said residence.

e.   The search warrant for the search of REZN8 was over-broad, in that it permitted the seizure of any and all records found within REZN8, without discretion to clients and facts of each record.   Search Warrant, Pg 2 P5 – Pg 3 P17.

f.   The search warrant for the search of ALI's homestead was over-broad, in that it was not narrowly tailored to specific pieces of evidence which could be expected to lead to crimes.  Search Warrant Pg 3 L18- Pg 4 L20.

g.  The search warrant for the search for REZN8 was over-broad, in that it allowed for and permitted the search and seizure of attorney-client privileged information.

h.  Probable cause in issuance of search warrant was based upon affidavit of defendant MONGE, which materially omitted exculpating facts and information provided by REZN8 which, but for these omissions, a finding of probable cause would not be possible.

i.  Probable cause in issuance of search warrant was further based upon hearsay statements of biased individuals without facts indicating any credibility of such hearsay statements which, but for these hearsay statements, a finding of probable cause would not be possible.

157. Plaintiffs allege each violation described in a – i above, individually, and as a whole, in determining the unconstitutionality of the search warrant. All of the above was conducted under the color of law.

158. As a direct result of Defendants' unlawful search and seizure of ALI's property, ALI was unable to use his credit cards and drive a vehicle.  No cause existed to seize and hold such items and the warrant does not permit the seizure of such.

159. As a direct result of Defendants' unlawful search and seizure of REZN8 and RAUFF's business materials, four hundred and one (401) homeowners are in threat of losing their home.  Of the four hundred and one (401), five (5) have fallen into default or have trustee sales dates on record.  REZN8 and RAUFF have been unable to conduct their business and face an undue risk of irreparable harm to their businesses.

**SECOND CAUSE OF ACTION**

**42 U.S.C. § 1983:  Violation of the Unlawful Search and Seizure Clause of the Fourth Amendment and Fourteenth Amendment**

**(As to all Plaintiffs as Against All Defendants in Their Official Capacities)**

160. Plaintiffs re-allege and fully incorporate by reference the allegations of Paragraphs 1 through 159 of this Complaint as though fully set forth herein.

161. Defendants violated the Fourth and Fourteenth Amendment guarantee against unlawful search and seizure by wrongfully executing the search warrant in the following ways:

   a. The Defendants' search of the place of business of REZN8 was conducted in a sweeping fashion, seizing any and all client files without catering the seizure to specific clients to whom the felony was alleged.

   b. The Defendants' searching the business of REZN8 seized all computers, as well as the server, in violation of the constitutional protections prohibiting "fishing" expeditions in computer systems.

   c. The Defendants' over-broad execution of the warrant seized files and computers containing the attorney-client privileged information of RAUFF.

   d. The Defendants' over-broad execution of the warrant seized files and computers containing the attorney-client privileged information of ALI, in both his business and personal computer.

   e. The Defendants' over-broad execution of the warrant seized files and computers belonging to Wajahat Ali, the son of ALI.

   f. The Defendants' over-broad execution of the warrant seized items not included in the warrant, including ALI's personal identification cards and credit cards.

g.    The Defendants, upon execution of the search warrant at ALI's residence, would not provide a copy of the search warrant upon multiple requests while conducting a search and seizing property.

162. Plaintiffs allege each violation described in a – g above, individually, and as a whole, in determining the overbroad and unreasonable execution of the search warrant.

163. All of the above was done under the color of law.

164. As a direct result of Defendants' unlawful search and seizure of ALI's property, ALI has not been able to use his credit cards and drive a car.  No cause existed to seize and hold such items and the warrant does not permit the seizure of such.

165. As a direct result of Defendants' unlawful search and seizure of REZN8 and RAUFF's business materials, four hundred and one (401) homeowners are in threat of losing their home.  Of the four hundred and one (401), five (5) have fallen into default or have trustee sales dates on record.  REZN8 and RAUFF have been unable to conduct their business and face an undue risk of irreparable harm to their businesses.

## THIRD CAUSE OF ACTION

### Violation of the Due Process Clause of the Fourteenth Amendment

### (As to REZN8 and ALI as against All Defendants)

166. Plaintiffs re-allege and fully incorporate by reference the allegations of Paragraphs 1 through 165 of this Complaint as though fully set forth herein.

167. Defendants have violated Plaintiffs' U.S. Constitutional guarantee of due process and fair notice, by claiming that any alleged breach of contract between REZN8 and their clients constitutes a "deceptive scheme" to commit fraud.

168. Fraud statutes do not apply to private contractual disputes. All of REZN8's clients have entered into an arm's-length contractual relationship with REZN8. Any alleged breach of

contract claim must be brought in a civil action in a court of proper jurisdiction, based on the duties found in the contract.

169. Defendants imply by innuendo in affidavit that REZN8 is engaged in "deceptive business practices." In order for such a claim to have any merit whatsoever, Defendants needed to say with **particularity** each and every instance of "deception," either by way of a failure to disclose material information to REZN8's clients or by way of providing information to clients that resulted in harmful reliance by REZN8 clients upon this information.

170. No statute exists imposing a duty on REZN8 to disclose added information to REZN8's clients.

171. No statute exists imposing fraud for the alleged breach of a contract.

172. Lacking any statutes to the contrary, defendants fail to give the slightest notice to REZN8 that an alleged breach of the contract would subject REZN8 to a fraud conviction.

173. Defendants have violated REZN8 and ALI's guaranty of due process because they have had no notice of the imposition of fraud for the alleged breach of a private commercial contract for services.

**FOURTH CAUSE OF ACTION**

**Declaratory Relief that SB 94 is Unconstitutionally Vague**

**(As to REZN8 and ALI as against All Defendants)**

174. Plaintiffs re-allege and fully incorporate by reference the allegations of Paragraphs 1 through 173 of this Complaint as though fully set forth herein.

175. SB 94 encourages arbitrary and discriminatory enforcement of its provisions in regards to "advanced fees" and "any compensation."

176. SB 94 is not drafted with sufficient definiteness in regards to "advanced fee" regulations. As such, ordinary people can not understand what conduct is prohibited.  In particular,

47

MONGE has asserted under oath that REZN8 has violated SB 94's prohibition on advanced fees by accepting post-dated checks which, pursuant to the contract with its clients, are cashed only upon completion of specific services.  Plaintiffs allege on information and belief that O'MALLEY and BELTRAMO directed MONGE to include such allegations in his affidavit.

177. Because of SB 94's vagueness, the statute is allowing arbitrary and discriminatory enforcement.

178. As a direct result of SB 94's unconstitutionally vague wording, Defendants have seized the business materials described above.  Defendants' interference with the business practices of REZN8 and RAUFF have now put in risk the continued homeownership of four hundred and one (401) homeowners and have damaged REZN8 and RAUFF by preventing them from conducting business.

## FIFTH CAUSE OF ACTION

### Declaratory Relief Regarding the Federal Rule of Lenity

(As to REZN8 and ALI as against All Defendants)

179. Plaintiffs re-allege and fully incorporate by reference the allegations of Paragraphs 1 through 178 of this Complaint as though fully set forth herein.

180. Defendants have violated the federal rule of lenity, by claiming that REZN8 has committed fraud because they may be in breach of a private commercial contract for services.

181. The rule of lenity demands resolution of ambiguities in criminal statutes in favor of the defendant.

182. Defendants have alleged criminal liability against plaintiffs for claimed violations of SB94 and CPC 487(a).  Lawyers, experts, and even the state bar association have yet to fully understand what "advanced fees" means under the ambit of SB94.  Also, there is no fraud or

"deceptive scheme" in regards to resubmission of a client file, or loan modification qualifications for potential client, because all the terms of the private contract for services are memorialized in the arm's-length contract entered into between the clients and REZN8.

183. Because SB94 and the defendants' interpretation of CPC 487(a) is vague, defendants are required under the rule of lenity, to resolve all ambiguities in favor of REZN8 and ALI. They have done the opposite, and essentially shut-down the business of REZN8.

184. Defendants have violated the federal rule of lenity by failing to resolve all ambiguities in light of REZN8 and ALI.

**SIXTH CAUSE OF ACTION**

**Declaratory Relief that SB 94 Violates the Contracts Clause, Art. 1 Sec. 10 of the United States Constitution**

**(As to All Plaintiffs as against All Defendants)**

185. Plaintiffs re-allege and fully incorporates by reference the allegations of Paragraphs 1 through 184 of this Complaint as though fully set forth herein.

186. SB 94 violates Art. 1 Sec. 10 of the United States Constitution by prohibiting "advanced fees" to be collected, which interrupts the obligations of currently entered contracts between REZN8 and its clients.  More specifically, Defendants' use of SB 94's prohibition on advanced fees to justify the seizure of Plaintiffs' business materials has materially hindered Plaintiffs' ability to perform their duties under preexisting contracts – and has thereby materially impaired their right to collect fees pursuant to those contracts.

187. Further, the seizure was to the direct detriment of four hundred and one (401) homeowners, with whom REZN8 and RAUFF are in privity of contract.

188. As a direct result of Defendants' seizure, REZN8, RAUFF, and the homeowners they represent have been deprived of their rights under preexisting contracts.

189. Plaintiff REZN8 does not have the ability to submit modifications, follow up with lenders, and in some cases supply the approved loan modification contracts to the client for the client to sign and return to the lender, because most if not all of REZN8's business materials have been impounded.

190. Plaintiff RAUFF does not have the ability to properly plead legal arguments against the lenders on behalf of the clients, because a significant portion of RAUFF's client files have been impounded by the DA.

191. There is no significant and legitimate purpose for SB94 to authorize Defendants to assert felonies and to search and seize all of Plaintiffs business materials.

192. Even if there is a significant purpose for SB94, the act is not reasonably and appropriately designed for its intended use.

193. The purpose behind SB94 was to protect homeowners from fraudulent home loan modification companies who are not in compliance with the licensing agency, the Department of Real Estate.

194. To permit the District Attorney's Office to act against companies who are otherwise approved by the DRE serves no significant and legitimate purpose, and is not reasonably and appropriately designed for its intended use.

195. As a direct result of Defendants' interference with the contracts of REZN8 and RAUFF, four hundred and one (401) homeowners are in threat of losing their home, and REZN8 and RAUFF have been harmed by the inability to conduct business.

**SEVENTH CAUSE OF ACTION**

**Violation of 42 U.S.C. § 1983**

**(As All Plaintiffs as against All Defendants in their Individual Capacities)**

50

196. Plaintiffs re-alleges and fully incorporates by reference the allegations of Paragraphs 1 through 195 of this Complaint as though fully set forth herein.

197. Defendants, outside the reasonable scope of their employment, have violated the Plaintiffs Fourth, Sixth and Fifteenth amendment rights, as well as Plaintiffs' right to contract.

198. Defendants, outside the reasonable scope of their employment, unlawfully interfered with Plaintiffs' right to contract, and have put at risk the continued homeownership of four hundred and one (401). In addition, Defendants have harmed Plaintiffs by significantly impairing their ability to conduct business.

199. Defendants, outside the reasonable scope of their employment, unlawfully searched and seized materials from the place of business of REZN8 and the personal residence of ALI, in violation of the Constitutional guarantee against unlawful search and seizure.

200. Defendants, outside the reasonable scope of their employment, unlawfully searched and seized materials from the place of business of REZN8 and the personal residence of ALI, without proper Due Process of Law.

201. Defendants, outside the reasonable scope of their employment, unlawfully interfered with the right of counsel by searching and impounding the business materials of RAUFF.

202. As a direct result of Defendants' interference with the business practices of REZN8 and RAUFF, four hundred and one (401) homeowners are in threat of losing their home.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

1. Issue judgment against the Defendants.

2. Issue declaratory judgment declaring the acts of the Defendants to be in violation of Plaintiffs' Constitutional rights to Due Process and from unlawful search and seizure.

3. Issue declaratory judgment declaring that no statutory standard currently exists for REZN8 to qualify clients for a loan modification, and that Defendants cannot prosecute Plaintiffs for violating such.

4. Issue declaratory judgment declaring that the resubmission of files by REZN8, as being investigated by Defendants, is not criminally culpable under California Penal Code section 487(a) and SB94, and that Defendants cannot prosecute Plaintiffs for such.

5. Issue declaratory judgment declaring that "advanced payments" does not include post-dated checks and automated clearing house payments, which Defendants cannot find criminally culpable, as defined in SB 94, and that Defendants cannot prosecute Plaintiffs for such.

6. Issue a declaratory judgment declaring that no "deceptive scheme" can exist because there is no duty to disclose information not within the four corners of the contract, and that Defendants cannot prosecute Plaintiffs for such.

7. Issue a declaratory judgment declaring that, under the rule of lenity, the ambiguities involved in interpreting SB94 and CPC 487(a) must be resolved in favor of the Plaintiffs.

8. Issue a declaratory judgment that SB94 is unconstitutionally vague on its face.

9. Issue a declaratory judgment that SB94 is unconstitutionally vague as enforced and as applied.

10. Issue a permanent injunction, enjoining Defendants, their agents, servants, employees, officers and the County of Alameda from investigating alleged conduct declared to not be criminally culpable under California Penal Code section 487(a) and SB 94.

11. Issue a temporary restraining order, and a preliminary injunction until this declaratory relief can be granted.

12. Order Defendants to return all seized business materials to Plaintiffs.

13. Award Plaintiffs costs, interest, and reasonable attorneys' fees for this action pursuant to 42 U.S.C. § 1983 and other relevant statutes;

14. Award Plaintiffs compensatory damages against Defendants in their individual capacities;

15. Award Plaintiffs punitive damages and sanctions against Defendants; and,

16. Order such other and further relief as the Court deems just and proper under the circumstances.

        __/s/ Jessica E. Rauff ____

        Jessica E. Rauff, Esq.
        Attorney for Plaintiffs
        REZN8 SYSTEMS, INC.
        MIRZA ZULFIQAR ALI
        JESSICA E. RAUFF, herself

        Date: June 11, 2010